Filed 10/22/21  P. v. Williams CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073445 |
| v. | (Super.Ct.No. RIF1901449) |
| ABDUAL DESEAN WILLIAMS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Thomas D. Glaser, Judge. Affirmed with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

1

In March 2019, appellant Abdual Williams confronted a lone woman as she walked past a car wash on the corner of 14th Street and Main Street in Riverside. Williams threatened to beat the victim with a golf club and then punched her in the face, breaking her jaw in two places. A jury convicted him of assault by means of force likely to cause great bodily injury and making a criminal threat.

Williams chose to represent himself at trial and argues on appeal the trial judge erred by (1) granting his request to represent himself and (2) refusing to allow him to revoke his election. Williams also argues the prosecutor committed misconduct during his closing argument by referring to his right of self-representation and commenting about the victim's fear of appellant. We conclude Williams knowingly, intelligently, and voluntarily invoked his right to self-representation and never revoked his decision. We also conclude the prosecutor did not commit misconduct. We therefore affirm Williams' convictions.

Williams argues the portion of the minute order prohibiting him from owning, possessing, and controlling deadly weapons and related paraphernalia should be stricken because it was not part of the oral pronouncement of judgment. The People conceded the discrepancy requires us to strike the terms "deadly weapon" and "related paraphernalia" from the minute order, and we agree.

# I

## FACTS

Around 11:00 p.m. on March 7, 2019, Riverside police officers were patrolling near a car wash at the corner of 14th Street and Main Street in Riverside. One of the officers testified at trial and described the area as "a high-crime area, and where local transients hang out, and drug transactions and sales of that nature [occur]."

The officers drove through the car wash and saw Williams and another person sitting in an alcove at the back of a building to the left. The officers approached Williams because the businesses were closed. One of the officers said he had previous contacts with Williams and knew him by the name of "Brown." As he explained on cross-examination by Williams, "I've heard your name from other homeless transients referring to a large black male named Brown, also known as Abdual."

One officer testified Williams had a golf club sitting next to him when they approached. The officer said he moved Williams away from the golf club for questioning because it could be used as a weapon. The second officer questioned the person who was with Williams, who didn't mention the golf club. The officer who questioned Williams described him as a tall individual while the second officer described the other man as being approximately five feet six inches tall.

Around 9:30 the next evening, S. was walking home from the Riverside Community Hospital near Main Street and 14th Street in Riverside when she thought she recognized a man she later identified in a photographic lineup as Williams, coming

3

towards her. As she tried to cut through the parking lot of the car wash, Williams called out to her. She stopped and looked back and saw Williams about three feet away from her holding a golf club in his left hand.

Williams asked S. who she was talking to. She responded, "Nobody. Why?" Williams responded, "don't lie to me, Bitch." He then said, "I could beat the hell out of you with this golf club." S. thought he was going to hit her with the golf club. As she kept her eye on his left hand, he hit her in the jaw with his right fist. She fell to the ground and lost consciousness for a few seconds. After regaining consciousness, S. crossed Main Street and headed to a food court where she thought she would find other people.

The next morning, S. went to Riverside Community Hospital to try to get medical attention because her face was, as she put it, "extremely out of place." She had swelling and bruises on both sides of her jaw, as well as bruises all the way down her neck. The hospital staff told her they would try to find a surgeon to take care of her. Sometime after midnight, she decided to leave after being told the staff could not find a surgeon.

As she was leaving the building, S. saw a tall man standing across the street. She thought he might be the man who had hit her. At trial, S. said she recalled telling the police she had thought Brown was waiting for her across the street and might hit her again, though she said she didn't tell them she was sure it was him. S. didn't leave the hospital exit area, but went back inside, where a social worker arranged for her to take a taxi to a Loma Linda hospital, where a surgeon was available to help her.

4

On March 10, 2019, at Loma Linda University Medical Center, S. told another police officer that Brown was holding a golf club when he approached her, he hit her on the right side of her face, and she lost consciousness and sustained two fractures of her jaw. S. expressed fear her assailant would retaliate against her. She told police she was scared that he would come back and beat her up, though at trial she said the comment was made in jest. S. also told police she did not want him to know that it was her who told them about the assault.

S. stayed at the Loma Linda hospital for three days so the swelling could subside. On the fourth day, a surgeon repaired her jaw, installing two titanium plates to hold it in place.

Around March 27, 2019, S. told a police detective she wanted to press charges against her assailant and said she would be able to identify him. The next day, S. positively identified Williams in a photographic lineup as the man who hit her. The identification process was recorded on video. The detective contacted the officer who approached Williams on the street on March 7 because he was familiar with the transients who lived in the area where the assault occurred. That officer told the detective a man named Abdual Williams was the person who went by the name Brown.

At trial, S. recanted her identification. She said she didn't know Williams and also claimed she didn't recognize the photographic lineup the prosecution showed at trial. She said the detective must have subsequently switched the photographs in the lineup because the lineup was not the same one she remembered. S. testified Williams was not the man

who attacked her, but she admitted she told the police and others the man who punched her was called Brown. She said she had described her assailant to the police as a very tall African-American man who had a short black afro and a bigger than average build, and she agreed Williams fit that description. She also recalled identifying Williams at the preliminary hearing as the man who smashed her face.

The prosecution also put on evidence Williams had been involved in a very similar assault less than a year earlier. On September 5, 2018, another Riverside police officer responded to a call for service concerning a woman who had been assaulted at White Park, located across the street from City Hall. When she arrived, the officer found a woman crying on the floor and bleeding from her right eyebrow area and complaining about how much her head hurt. The next day, the officer walked around the area in White Park where the woman said she had been assaulted. She found dry blood that was consistent with the victim's account. During a police interview on September 12, 2018, Williams admitted he struck a woman two to three times in the face and that the woman had to go to the hospital as a result. Williams also admitted he was known on the streets as Brown.

On July 11, 2019, after a trial at which Williams represented himself, a Riverside County jury found him guilty of assault by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4), unlabeled statutory citations refer to this code) and making a criminal threat (§ 422). The jury also found Williams had personally inflicted great bodily injury on his victim (§§ 1192.7, subd. (c)(8) & 12022.7, subd. (a)) and had

6

personally used a deadly and dangerous weapon—the golf club—in making the threat (§§ 1192.7, subd. (c)(23) & 12022, subd. (b)(1)). Later, the trial judge found Williams had a prior strike conviction.

On August 13, 2019, the trial judge sentenced Williams to state prison for a total term of 11 years.

Williams filed a timely notice of appeal.

## II

## ANALYSIS

A.    *Self-Representation*

Williams argues the trial judge erred by allowing him to represent himself and failing to accept his revocation of that choice.

1.  *Additional background*

On June 28, 2019, defense counsel informed superior court Judge John D. Molloy that Williams might want to represent himself because he was unwilling to waive his right to have trial commence the following Monday.

The trial judge explained to Williams what would happen if the prosecutor was ready to move forward with the trial, defense counsel was not ready, and Williams was not willing to extend the statutory 60-day window within which his trial had to start. "This is what happens on Monday. If [the prosecutor] shows up and says he's ready to go and [defense counsel] or somebody else who has been assigned to represent you shows up and says they are not ready and you say, 'I'm not waiving time,' then the questions I'll

ask go like this: 'Well, are you prepared to represent yourself?' And if you say, 'yes,' I'll say, 'Are you going to need a continuance if you represent yourself?' And if you say, 'No. I'm ready to go right now,' I'll say, 'Okay.'"

The trial judge pointed out the significance of the decision whether to be represented by counsel or to elect to represent yourself. "I'll give you a—it's called a *Faretta* admonishment. And if you say, 'I really want to represent myself,' I have to let you. Under those circumstances, you're ready to go and you want to represent yourself, the Constitution requires me—that is a constitutional right that I have to let you represent yourself. [¶] And I'll repeat this on Monday if you say you're going to do something like that. That's a bad idea. Every time I've seen somebody do that, they have crashed and burned in horrible ways. In fact, they have admitted things that the People—there's no way they could prove, until they took the stand or did something to admit."

After defense counsel said he would likely need a month and a half continuance to defend Williams, the trial judge advised Williams it would be his decision whether to waive time for starting his trial. He explained if Williams was unwilling to waive time, they would return to court on Monday and he'd have a new attorney representing him. Williams indicated he understood. The judge explained if the new attorney wasn't ready to represent Williams on Monday, they would be having the same discussion of whether he'd be willing to waive time again.

On Monday, July 1, 2019, the prosecutor announced he was ready for trial. A new defense attorney who had been assigned to represent Williams told the judge he was not ready to proceed with the trial since he received the case file at 3:00 p.m. on Friday. Counsel said he would need at least three weeks to be ready for trial. He reported that Williams wished to proceed in propria persona.

The judge asked Williams if he would agree to the continuance. He explained he would direct counsel to proceed to trial now if he thought the reason for asking for the continuance weren't significant. Since the attorney had a very good reason for asking for time to prepare, the judge indicated he would be inclined to grant the continuance over Williams' objection. However, he acknowledged Williams had the right to invoke his right to represent himself and begin trial immediately. Williams responded that he would not agree to a continuance and said he wanted to represent himself. The judge asked Williams if he was ready to start selecting a jury that day, and he said yes.

The judge then tried in the strongest of terms to discourage Williams from representing himself. "Every time I see someone represent themselves, it's like – it's like they're driving full speed ahead into a brick wall." He explained that if he insisted on representing himself, he would need to complete a form they would review together. Williams repeatedly said he understood and then completed the waiver form.

The judge then went over the waiver form with Williams, emphasizing the importance of the choice. "So the bottom line, what we're telling you, is, if you can't afford an attorney, we'll appoint one to represent you." He then likened a lay person

9

representing himself at trial to a team sending out 11 players who didn't know the rules of American football to compete in the Super Bowl.

The judge then described the parts of a trial—jury selection, opening statements, examination of witnesses, jury instructions, and final arguments—and how Williams would need to make strategic decisions at each stage. He explained Williams would be responsible for those choices just as if he were an attorney and that he wouldn't be able to argue any errors were due to ineffective assistance of counsel.

The judge warned Williams not to choose self-representation. "All right. You're a grown man. You can make your own decisions, sir, and I'll respect those. Now, what you're asking for is of constitutional significance here. If you really want to represent yourself and you're ready, you have a constitutional right to do so, but I'm going to tell you, just from the hip, I don't think you should do this. . . . [B]ut having said those things, do you wish to represent your[self] at this time, sir?" Williams responded, "I have no choice; yes, sir." The judge found a knowing and intelligent waiver of his right to counsel, and granted the petition.

Later that morning, superior court Judge Samuel Diaz, Jr. called Williams' case for trial. Noticing Williams was wearing his jail attire, the judge asked him: "So I don't understand what's going on. This is set for trial. Today's the last day. I have jurors waiting downstairs. Do you have an investigator or someone I could call to make sure you have clothes?" Williams answered, "They just—this is it right here." The judge asked Williams if he was representing himself. Williams said he was. Judge Diaz asked if

10

he understood he had a right to have a lawyer represent him. Williams said he did. The trial judge told Williams they would try to get him civilian clothes as soon as they could but said he might have to begin the proceedings before he was able to change.

The judge asked Williams if he had announced he was ready to go forward with trial, and Williams confirmed he had. He asked Williams if he understood what it means to say, "'I'm moving forward to go to trial'?" Williams said it meant "We're proceeding to pick a jury." The judge asked, "Once we pick a jury, what else?" Williams said he didn't know. He said, "This is like – they just – they just forced me. They basically forced my hand. I don't know. I don't know." The judge objected that no one forced him to decide whether he wanted a lawyer. Williams responded, "I want a lawyer, but it's like they're forcing me to go outside my 60-day trial rights. You know what I mean? So it's like I'm forced to just do—I'm forced to do this." The judge responded, "No one's forcing you. Once again, you announced ready." He emphasized the decision whether to accept counsel and delay trial was a personal decision, and Williams said he understood.

The judge then told Williams he needed to decide whether he wanted to be dressed in civilian clothes. The judge noted the clothing might not be available before jury selection if the trial was to proceed that day. The judge asked Williams what he would like to do, and Williams said he would like to proceed.

When the court reconvened in the afternoon, the judge told Williams they wouldn't be able to get him dressed in civilian clothes in time to begin trial and asked whether Williams would accept a one-day continuance so that he could wear civilian

11

clothing for the opening of his trial. The trial judge confirmed Williams was ready to proceed in propria persona. Williams then represented himself through the conclusion of his jury trial.

### 2. *Petition for self-representation*

Williams argues the trial judge erred by accepting his *Faretta* waiver allowing him to represent himself. He claims he didn't voluntarily and unequivocally waive his right to counsel, and his words made it clear he had no desire to represent himself.

A criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. (*Faretta v. California* (1975) 422 U.S. 806, 819, 835-836 (*Faretta*).) A trial judge must grant a defendant's request for self-representation if the request is timely and unequivocal and made voluntarily, knowingly, and intelligently. (*People v. Johnson* (2019) 8 Cal.5th 475, 499.) However, "'a [*Faretta*] motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation.'" (*People v. Stanley* (2006) 39 Cal.4th 913, 932.)

When ruling on a *Faretta* motion, "'[t]he relevant inquiry is narrow. The trial court is not concerned with the wisdom of defendant's decision [regarding self-representation], or with how well [they] can do so. The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation. [Citations.] The court has discretion to determine the defendant's competence to waive counsel; its ruling will not

12

be disturbed on appeal absent an abuse of that discretion."' (*People v. Ware* (2020) 52 Cal.App.5th 919, 959.)

Here, Williams made a knowing, voluntary, and unequivocal request for self-representation. On Friday, June 28, 2019, Williams had indicated to the trial court that he was unwilling to waive time for an attorney to prepare for trial, even though his trial had to begin the following Monday. When that day came, Williams' appointed counsel appeared and said he wasn't ready to proceed with trial because he had received the case file at 3:00 p.m. on the Friday before. Counsel said he would need a continuance of three to four weeks to prepare.

Williams understood his attorney was not ready to proceed with the trial but was unwilling to agree to a continuance. Williams told the trial judge he wished to represent himself, was ready to proceed with the trial, and was prepared to start selecting a jury that day. The judge told Williams he discouraged him from representing himself, and Williams said he understood. When the judge reviewed the *Faretta* form with Williams, he reminded Williams he had the right to a court-appointed attorney and recommended he accept court-appointed counsel or at least meet his attorney before giving up his right to legal representation. The judge then explained the pitfalls of self-representation and explained Williams would be held to the same standards as an attorney. When the judge asked Williams if he still wished to represent himself, he responded, "I have no choice; yes sir."

Williams' request to represent himself was considered and he was adamant about asserting it as the way to ensure he received a speedy trial. He didn't make the motion to represent himself on a temporary whim, or out of annoyance or frustration. He knew he had the right to appointed counsel and was fully and repeatedly apprised of the dangers of self-representation. Against this advice, he decided his right to a speedy trial was more important than his right to representation by counsel. He asserted his right to self-representation repeatedly, stated he was ready to move forward with the trial, and said he understood he would be held to the same level as an attorney and expected to know the rules of evidence. Indeed, Williams reasserted the importance of proceeding quickly to trial when he rejected a continuance of only one day so he could wear civilian clothes, instead of jail attire, in front of the jury.

On this record, we can't conclude the trial court erred in determining Williams made a knowing, voluntary, and intelligent request to represent himself.

### 3. *Revocation of the waiver of the right to counsel*

Though criminal defendants have a constitutional right to represent themselves under *Faretta*, the "right, 'once asserted,' may be waived or abandoned." (*People v. Trujeque* (2015) 61 Cal.4th 227, 262.) "A defendant's waiver or abandonment of this constitutional right should be voluntary, knowing and intelligent [citation]; such waiver or abandonment may be inferred from a defendant's conduct." (*Id.* at pp. 262-263.)

14

A trial judge has wide discretion in deciding whether to appoint counsel for a criminal defendant who previously invoked their *Faretta* right. (*People v. Lawrence* (2009) 46 Cal.4th 186, 191-192 (*Lawrence*).) However, before we are faced with deciding whether a trial judge abused their discretion by denying such a motion, there must first be "an unequivocal request to revoke his in propria persona status." (*Id.* at p. 193, citing *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002 ["*Faretta* motions must be both timely and unequivocal. Otherwise, defendants could plant reversible error in the record"].)

The problem with Williams' argument is that he never actually asked to revoke the decision to represent himself. Despite the trial judge's repeated efforts to dissuade him from representing himself at trial, Williams elected self-representation because he insisted he would not waive time for his appointed counsel to prepare for trial. Thereafter, every time the judge reminded him of his right to counsel or reminded him of the risks and consequences of self-representation, Williams assured the court he wished to continue representing himself. Williams confirmed he understood the decision to represent himself was his personal decision and said he was ready to move forward with the trial, acting as his own lawyer.

Williams directs us to a point in the transcript where he appeared to waver about the choice he was making. Before voir dire, the trial judge asked Williams if he understood what it meant to say, "I'm moving forward to go to trial." He responded, "Yes." But when asked if he knew what happened after picking a jury, he responded, "I

15

don't know, sir. This is like—they just—they just forced me. They basically forced my hand. I don't know." The trial judge corrected Williams, saying "Sir, no one forced you to make a decision whether or not you want a lawyer or not. That's your decision." Williams then replied, "I want a lawyer, but it's like they're forcing me to go outside my 60-day trial rights." Again, the trial judge corrected Williams, pointing out that the decision was his and no one would stop him from deciding whether to waive his speedy trial right and be represented by a lawyer or to waive his right to a lawyer and have a speedy trial. Williams confirmed he understood the choice and chose to proceed with a speedy trial.

Williams' expression of regret that he had to choose between which of two conflicting rights to exercise did not constitute a revocation of his *Faretta* waiver. On the contrary, this colloquy shows Williams in fact confirmed the choice he had already made. He argues it is reasonable to infer he told the court he wanted counsel because he realized he needed counsel. However, as in *Lawrence*, the record "provides an insufficient basis for us to conclude that defendant made a request to revoke his in propria persona status, that the trial court denied it, or that the circumstances rendered any denial an abuse of discretion." (*Lawrence*, *supra*, 46 Cal.4th at p. 194.)

B. *Prosecutorial Misconduct*

Williams argues the prosecutor infringed upon his rights to due process and a fair trial by engaging in a pattern of misconduct during his closing argument—arguing facts

not in evidence, appealing to the jury's passions and fears, and injecting his own personal opinions.

"'""As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety."'"" (*People v. Ayala* (2000) 23 Cal.4th 225, 284.) The California Supreme Court has held when a defendant does not object to remarks in closing argument claimed to be prosecutorial misconduct, the defendant is deemed to have forfeited the objection. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) A claim of prosecutorial misconduct will not be deemed forfeited only if an objection would have been futile or an admonition ineffective. (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

A prosecutor's conduct rises to the level of misconduct under the federal Constitution only "when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [cleaned up].) Under state law, misconduct occurs only where it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*Id.* at p. 1215 [cleaned up].)

"When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'"" (*People v.*

*Thompson* (2010) 49 Cal.4th 79, 121.) We consider the remarks in the context of the whole argument and the instructions. (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.) We don't "lightly infer that the prosecutor intended [her] remarks to have their most damaging meaning or that the jury drew that meaning rather than the less damaging one." (*People v. Howard* (1992) 1 Cal.4th 1132, 1192.)

        1.  *The prosecutor's reference to Williams' self-representation*

Williams argues the prosecutor committed misconduct by arguing the jury should not feel sympathy for him because he was not represented by an attorney.

The prosecutor mentioned Williams' decision to represent himself in his closing argument. "I'm going to share a little bit, just as an aside, so three weeks ago, I was sitting exactly where you guys were in San Bernardino, all right. I served as a juror up there, in a trial that lasted three weeks. [¶] Very interesting, very rewarding. Knowing what happens in the room back there, I'm going to ask you, I'm going to double down on this, just a couple things I'm going to ask you to do, I'm going to beg you to do, and the judge is going to order you to do because it is in fact the law. [¶] Okay. Number one thing, and after talking about this, and we started jury selection, is sympathy. Okay? I don't know whether you feel any sympathy for Mr. Williams. Okay. Certainly, you may have felt during the course of the trial, that it would have been different if he had representation. If there was an attorney on his side. All right? [¶] That's normal. All right. You might get an underdog feeling, but remember, he has got a constitutional right to

18

make this choice. And the government can't take that from him. That is his choice. He's a grown man, he made –"

Williams acknowledges the truth of what the prosecutor told the jury but argues the "[u]se of facts not in evidence suggested to the jury that the prosecutor had personal knowledge of matters not known to the jurors." We conclude the prosecutor did not commit misconduct when he referred to Williams' choice to exercise his constitutional right to self-representation.

As we've discussed, Williams represented himself throughout the trial and—as is frequently true in such cases—it became clear he did not have the background or experience to match up with the prosecution. For example, the trial judge ended up overruling the majority of his objections, and Williams did very little with the opportunity to cross-examine the prosecution's witnesses. The mismatch between prosecution and defense would have been evident to the jury, and sympathy would be a normal human reaction. In referring to Williams' choice to represent himself and its constitutional basis, the prosecution was asking the jury to focus on the facts and remember the trial judge's instruction not to "let bias, sympathy, prejudice or public opinion influence your decision." Nothing about the reference to Williams' right to represent himself implied the prosecutor had any personal knowledge regarding the facts of the case or to matters not known to the jurors. We therefore conclude the argument was not misconduct.

### 2. *Argument about the victim's recantation*

Williams argues the prosecutor also committed misconduct by arguing his theory that S. "recanted her prior identification of appellant as her assailant because she feared that appellant would beat her in retaliation for reporting him to the police."

The comments Williams objects to were the prosecutor's attempt to convince the jury S. had lied on the witness stand when she recanted her accusations against Williams. He did so by pointing out the implausibility of portions of her testimony. "When you saw, [S.] take that stand, and desperately, desperately try to lie this man's way to freedom so that he can escape responsibility. I hope it was very clear to you, during the course of her testimony, that yes, she wants to convince you that we got the wrong guy, there was no pain during the surgery, she wasn't scared, when a giant man with a club said he was going to beat her with it. [¶] Okay. You were here in the courtroom, but there was an audience of one. Because her entire purpose is to convince the man [who] assaulted her that it's not her fault. That she is trying to get him out of this. She didn't want the police to be involved. She didn't call the police. She simply got the wrong guy." The prosecutor also pointed out her story relied on an implausible police conspiracy. "[S]he'll go further than that, she's going to blame a longstanding police detective, okay, of committing a crime just to set up this man who he has no motive to do so. He's going to risk his job just to set up Mr. Williams."

20

The prosecutor argued her motive to lie was fear of her assailant. "She's desperate to avoid the retaliation she knows is going to happen out there on the streets. She doesn't have a home. She does not have walls to hide behind. She will roam areas, and he will find her. We can understand why somebody would feel that fear. We can understand why someone would be so afraid of someone who had so violently attacked them, that he distorted the way she looks for the rest of her life. [¶] That's something to think about. When you try to understand why did she come here and give a different story. Why was it, when she was laid up in that bed at Loma Linda, it was Brown. He did this. Why was it still at prelim it was Brown, he did this. Identifying him 'Oh, God, yes.'" In this regard, he pointed out S.'s conduct at trial. "That fear, getting threatened, and horribly beaten with one punch, it didn't just stop after the surgery. It extends. Did you notice how many times she looked at him? Very few. Because that's painful, and if she looks at him, she's scared of what she's going to see. [¶] She's scared of what she has coming. But she's going to dig in and try to make sure she derails that train so it never gets there. That's what she tried to do. So that is a huge personal interest in how this case is decided."

The prosecutor also pointed out S.'s own statements to police indicated her fear. "Look at what she said. Sitting there laid up in the hospital, her face swollen, Officer Allen asked her what are you scared about? That he'll come back and beat me up. She wasn't beaten enough. She still has fear that he has more to take from her. [¶] . . .[¶] She told the cops very clearly that she did not want him to go to jail. Why? She's tired. I don't want him to go to jail. I'm just tired. She's obviously fearful. She thinks he'll kill

21

somebody. She said that. That somebody is her. Perhaps the most sad thing that I heard on that body cam, you may have noticed this, too, is after he had smashed her to the ground and rendered her unconscious – [¶] . . . [¶] – she came to, and, she asked him for forgiveness."

There's nothing wrong with the prosecutor's use of the evidence to try to convince the jury to discount the victim's testimony recanting her identification of Williams as her assailant. The evidence showed S. was hit so hard that her jaw was fractured in two places. Her mouth was "uplifted" and "off track," and her jaw needed three days for the swelling to subside before surgery. That evidence supports the prosecutor's implication that S. was lying when she said she didn't feel any pain from the injury. The evidence also showed S. had positively identified appellant as her assailant in a photographic lineup but had a sustained fear of him. Williams complains that the prosecutor supported his theory by telling the jury S. was homeless when that fact wasn't established by direct evidence. We think the evidence about these events warrant the inference, which the prosecutor was permitted to encourage the jury to make. With that background, the prosecutor acted reasonably by suggesting the jury should conclude S. was not being truthful on the witness stand only because she was afraid of retaliation. Prosecutors have wide latitude when arguing to a jury and may urge whatever conclusions they deem proper based upon the evidence. (*People v. Lewis* (1990) 50 Cal.3d 263, 283 ["the prosecutor has a wide-ranging right to discuss the case in closing argument. He has the

right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper"].)

We conclude the prosecutor did not engage in misconduct when he tried to present a reasonable explanation for why S. insisted on the witness stand that her badly fractured jaw did not result in any pain and Williams was not her assailant when she had previously identified him as such.

C. *The Order Prohibiting Possession of Deadly Weapons and Paraphernalia*

Williams argues the sentencing minute order improperly prohibits him from owning, possessing, and controlling deadly weapons and related paraphernalia when that term was not part of the trial judge's oral pronouncement of the sentence. The People concede the order should be stricken, and we agree.

"In a criminal case, it is the *oral pronouncement of sentence* that constitutes the judgment." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.) In the event of a discrepancy between the oral pronouncement of judgment and a minute order or an abstract of judgment, the oral pronouncement controls. (*People v. Morales* (2014) 224 Cal.App.4th 1587, 1594; *People v. Zachery* (2007) 147 Cal.App.4th 380, 385.)

At Williams' sentencing hearing, the trial judge ordered him "not to own, possess, or have under his control any firearm and/or ammunition for life." The minute order codifies the order as saying, "Do not knowingly own, possess or have under your control any firearm, *deadly weapon*, ammunition, *or related paraphernalia*, for life."

It follows that we must correct the discrepancy by ordering the trial court to modify the minute order. (E.g. *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts"].) We will therefore order the trial court to strike the terms "deadly weapon" and "related paraphernalia" from the clerk's minute order for August 13, 2019.

### III

### DISPOSITION

We order the trial court to strike the terms "deadly weapon" and "related paraphernalia" from the clerk's minute order for August 13, 2019. We affirm the judgment in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

MENETREZ
J.

24